IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. BK09-41726-TJM |
| | ) | |
| ROYCE ALAN KENNICUTT, | ) | CH. 7 |
| | ) | |
| _____Debtor(s)._____ | ) | |
| LARRY SHIELDS and SERENA SHIELDS, | ) | ADV09-4058-TJM |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROYCE ALAN KENNICUTT, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Trial was held in North Platte, Nebraska, on July 1, 2010, regarding the complaint requesting a judgement of non-dischargeability of a debt owed by the debtor to the plaintiffs. Brian Koerwitz appeared for the plaintiffs and James Bocott appeared for the defendant. This case was tried at the same time as Wendell v. Kennicutt, Adv. Proceeding No. A09-4060. All of the exhibits for this case and the Wendell case have been filed in the Wendell case. They were all admitted for both trials.

FACTS

The debtor, Royce Kennicutt ("Kennicutt"), was in the business of selling and constructing steel buildings, usually for use by farmers and ranchers. The business grew quickly from six or eight jobs in 2005 to twelve jobs in 2006, to twenty jobs in 2007, and more than twenty in 2008. In 2008, he ran into financial difficulties when storms destroyed partially finished buildings on which he did not have insurance. He was required to purchase material for the buildings twice and to build them twice. He was not able to charge his customers for the rebuilding so he became short of cash by $150,000 to $200,000. He owed suppliers, sometimes paid with bad checks and sometimes paid with checks that overdrew the bank account, but the bank covered.

In January of 2009, Larry Shields, a farmer/rancher who lives southeast of McCook, Nebraska, contracted with Kennicutt to build a steel building on a concrete foundation that had previously been used to support a building on the Shields property. Shields and his wife had seen ads in a local advertising flyer called "Midwest Messenger" that led them to believe Midwest Buildings was an actual company that manufactured steel buildings.

In discussions with Kennicutt, the Shields were not told that Kennicutt was actually doing business as Midwest Buildings. Kennicutt told Shields he was a dealer who obtained supplies from a separate company and then, as the contractor, would construct the buildings. Mr. Shields would not have dealt with Kennicutt if he had known Midwest Buildings was not a separate manufacturing entity.

On January 21, 2009, a contract was entered into and a check for $3,896, made payable

to Midwest Buildings, was delivered to Kennicutt. Kennicutt orally promised that he could get to the project within six weeks, depending upon the weather. However, he never did begin the project. He did not order the materials and he did not return any of the money provided by the Shields.

At the time the contract was entered into, Kennicutt was in significant financial difficulty. In late 2008, he had insufficient funds checks outstanding to suppliers. He had an overdraft of more than $100,000 on his business operating account at his lender at the end of October 2008, and after obtaining additional loan funds from the lender and a contract pre-payment of more than $60,000 from another customer, the Wendells, the bank account on December 31, 2008, contained less than $30,000. That amount was insufficient to purchase the materials for the Wendell project and the addition of the funds for the Shields project did not put Kennicutt in a position to purchase the material for either the Wendells or the Shields.

Sometime during the winter of 2009, Kennicutt's bank called his note obligations due and exercised its rights under its security agreements and picked up Kennicutt's equipment which was collateral for his loans. As a result, he did not have any equipment available to build the building.

As it turns out, there was no manufacturing company named Midwest Buildings that Kennicutt was the dealer for. He never intended to purchase a building from such manufacturing company. If he had had the money and equipment, he would have purchased the steel from one company, trusses from another company, and other materials necessary for constructing the building from whatever companies he could obtain the best price.

## CONCLUSIONS OF LAW AND DISCUSSION

The Bankruptcy Code prohibits the discharge of a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition[.]" 11 U.S.C. § 523(a)(2)(A). To establish fraud within the context of § 523(a)(2)(A), the creditor must show, by a preponderance of the evidence, that: (1) the debtor made a representation; (2) the representation was made at a time when the debtor knew the representation was false; (3) the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained a loss as the proximate result of the representation having been made. R & R Ready Mix v. Freier (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010).

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." Merchants Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (quoting RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995)). "A 'false pretense' involves implied misrepresentation or conduct intended to create and foster a false impression." Moen at 791 (quoting In re Guy, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988)). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." Moen at 791 (quoting In re Malcolm, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). False representations may be by omission or commission. Caspers v. Van Horne (In re Van Horne), 823 F.2d 1285, 1288 (8th Cir. 1987), abrogated on other grounds, Grogan v. Garner, 498 U.S. 279 (1991). A "misrepresentation" is "not only words spoken or written but also

-2-

any other conduct that amounts to an assertion not in accordance with the truth." Moen at 791 (quoting LA Capitol Fed. Credit Union v. Melancon (In re Melancon), 223 B.R. 300, 308-09 (Bankr. M.D. La. 1998)). A debtor's silence regarding a material fact may constitute a false representation actionable under § 523(a)(2)(A). Fee v. Eccles (In re Eccles), 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009).

A material promise to perform in the future "made with the intent to defraud and without the intent to perform . . . constitutes actionable fraud." Freier, 604 F.3d at 588 (quoting McDonald v. Johnson & Johnson, 722 F.2d 1370, 1379 (8th Cir. 1983)).

"Justifiable reliance" is the appropriate standard to apply under § 523(a)(2)(A), and is a lower standard that "reasonable reliance," entailing no duty to investigate. Treadwell v. Glenstone Lodge, Inc. (In re Treadwell), 423 B.R. 309, 314 (B.A.P. 8th Cir. 2010) (citing Field v. Mans, 516 U.S. 59 (1995)). However, a creditor cannot rely upon false representations if the falsity is obvious. Id. at 315. A statement by the debtor that he does not intend to pay the debt is an obvious warning sign of falsity, but "repeated requests to postpone payment, without more, do not rise to the level of obvious warning signs of falsity." Id.

By his advertising materials and his discussions with the Shields, Kennicutt led them to believe that he was a dealer for Midwest Buildings, a separate company.

Kennicutt made at least one material false representation. That is, in addition to advertising there was a company called Midwest Buildings, he stated he was a dealer for Midwest Buildings and would obtain the materials necessary for the construction from such entity. At the time he made the misrepresentation, he knew it was false. He made the misrepresentation with the intent to deceive the Shields. He wanted potential customers to believe there was a separate manufacturing company that he was a dealer for so the potential customer would employ his services and not those of other companies that actually did manufacture and deliver the components of a steel building as a complete package. The Shields justifiably relied upon the representation made by Kennicutt and they suffered damages in the amount of $3,896.

Although Kennicutt testified that he always intended to complete all of the projects he had contracted for, his stated intent is inconsistent with his financial situation. During 2008 and early 2009, he was in a cash flow squeeze. He had written a number of bad checks, some of which caused him to have to deal with the county attorneys in a number of counties. He owed suppliers significant amounts of money. Even after he deposited the checks from the Wendells and the Shields, his account balance was significantly less than what it would cost to purchase the materials or pay labor to construct the Shields and the Wendell buildings.

He testified that he had ongoing jobs at the time he accepted the check from the Wendells and from the Shields and he anticipated those jobs would eventually provide him with sufficient funds to enable him to construct the buildings. However, he admits that, in the early winter of 2009, he was unable to complete a job that would have paid him $30,000 because he was unable to come up with $800 necessary to purchase the final materials for that job.

He may have had the subjective intent, based upon wishful thinking, to complete the Shields construction. However, he had to know, based upon his overdrafts and his bank balances, that it was unlikely he would be able to finance the purchase of materials and pay the necessary labor to complete the project.

-3-

From Kennicutt's written advertising materials and his oral statements, the Shields justifiably relied, to their detriment, on the fact asserted by Kennicutt that there actually was a company that would manufacture the product they were purchasing and deliver it to the site.

The Shields have presented sufficient evidence that they were induced to pay Kennicutt $3,896 based upon intentional misrepresentation. Therefore, the Kennicutt debt to the Shields in the amount of $3,896 is non-dischargeable under 11 U.S.C. § 523(a)(2)(A). A separate judgment shall be entered.

DATED:        July 22, 2010

BY THE COURT:

/s/ Timothy J. Mahoney
United States Bankruptcy Judge

Notice given by the Court to:
    Brian Koerwitz
    James Bocott
    U.S. Trustee